**RECORD NO. 17-4488**

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JAMES MICHAEL FARRELL,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT
HONORABLE ROGER W. TITUS PRESIDING

**OPENING BRIEF OF APPELLANT
JAMES MICHAEL FARRELL**

Barry Coburn
Coburn & Greenbaum, PLLC
2nd Floor
1710 Rhode Island Avenue
Washington, DC 20036
(202) 470-6706 Telephone
Barry@coburngreenbaum.com

*Counsel for Appellant*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................i

TABLE OF AUTHORITIES ........................................................................ iii

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................1

STATEMENT OF THE CASE........................................................................2

STATEMENT OF THE FACTS ......................................................................3

BACKGROUND .........................................................................................4

    Appellant's Law Practice..................................................................4

    The Money Laundering Conspiracy Charge .....................................6

    The Money Transfers to Pay for Legal Representation ....................8

    Charges Related to Appellant's Interactions with Jacob Harryman .............12

    Charges Related to Interactions with Ryan Forman......................16

    Jury Note........................................................................................20

SUMMARY OF ARGUMENT ....................................................................20

STANDARDS OF REVIEW .......................................................................22

    I.   Willful Blindness Instruction ................................................22

    II.   Allen Charge ........................................................................22

    III.  Sufficiency of the Evidence ..................................................22

IV.  Denial of Motion to Suppress ..................................................22

ARGUMENT ..............................................................................23

I.    The Evidence Did Not Support A Jury Instruction on Willful
      Blindness ........................................................................23

II.   The Allen Charge Was Unduly Coercive .................................29

III.  The Jury's Verdict Finding Appellant Guilty of Counts 4, 8 and 9
      Was Not Based on Sufficient Evidence ...................................31

IV.   Appellant's Convictions for Money Laundering and Money
      Laundering Conspiracy (Counts 1, 2, 3, 5, 6, 7, and 12)  Were Not
      Based On Sufficient Evidence ...............................................38

V.    The Trial Court Erred in Denying Appellant's Motion to Suppress
      His Conversations with Clients ..............................................41

VI.   The Trial Court Erred in Admitting Testimony About Practices of
      Other Lawyers .................................................................44

CONCLUSION ...........................................................................48

CERTIFICATE OF COMPLIANCE....................................................49

CERTIFICATE OF SERVICE ..........................................................50

# TABLE OF AUTHORITIES

## CASES

*Buckman v. Bombardier Corp.*,
893 F.Supp 547 (E.D.N.C. 1995) .................................................................46

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011).........................................................................................25

*Hunt v. Blackman*,
128 U.S. 464 (1888) .........................................................................................42

*Swidler & Berlin v. United States*,
524 U.S. 399, 118 S. Ct. 2081, 141 L. Ed. 2d 379 (1998) .............................43

*United States v. Abbas*,
74 F.3d 506 (4th Cir. 1996) ............................................................................22

*United States v. Alerre*,
430 F.3d 681 (4th Cir. 2005) ..........................................................................22

*United States v. Baldridge*,
559 F.3d 1126 (10th Cir. 2009) ......................................................................35

*United States v. Blair*,
661 F.3d 755 (4th Cir. 2011) ..............................................................27, 28, 35

*United States v. Bolden*,
325 F.3d 471 (4th Cir. 2003) ..........................................................................39

*United States v. Bonner*,
735 F. Supp. 2d 405 (M.D.N.C. 2010) ...........................................................33

*United States v. Boone*,
458 F.3d 321 (3rd Cir. 2006) ..........................................................................30

*United States v. Burgos*,
55 F.3d 933 (4th Cir. 1995) ......................................................................22, 30

*United States v. Burgos*,
 94 F.3d 849 (4th Cir. 1996) ...................................................................33

*United States v. Campbell*,
 977 F.2d 854 (4th Cir. 1992) ..................................................................23

*United States v. Collins*,
 412 F.3d 515 (4th Cir. 2005) ..................................................................33

*United States v. Cone*,
 714 F.3d 197 (4th Cir. 2013) ..................................................................23

*United States v. Cornell*,
 780 F.3d 616 (4th Cir. 2015) ..................................................................30

*United States v. Crandle*,
 274 F. App'x 324 (4th Cir. 2008).............................................................37

*United States v. Cropp*,
 127 F.3d 354 (4th Cir. 1992) ..................................................................30

*United States v. Doss*,
 630 F.3d 1181 (9th Cir. 2011) ................................................................34

*United States v. Ebert*,
 1999 U.S. App. LEXIS 8453 (4th Cir. 1999)......................................24, 25

*United States v. Farrell*,
 126 F.3d 484 (4th Cir. 1997) .............................................................35, 37

*United States v. Foster*,
 507 F.3d 233 (4th Cir. 2007), *cert. denied,* 552 U.S. 1274 (2008) ................33

*United States v. Greenwood*,
 796 F.2d 49 (4th Cir. 1986) ....................................................................46

*United States v. Hale*,
 1992 U.S. App. LEXIS 16148 (4th Cir. July 15, 1992) ................................24

*United States v. Heaps*,
   39 F.3d 479 (4th Cir. 1994) ..................................................................26

*United States v. Hernandez*,
   975 F.2d 1035 (4th Cir. 1992) ...........................................................46, 47

*United States v. Hutcherson*,
   No. 6:05CR00039, 2006 U.S. Dist. LEXIS 6652
   (W.D. Va. Feb. 3, 2006) ...................................................................37, 38

*United States v. Jackson*,
   443 F.3d 293 (3rd Cir. 2006) ..............................................................30

*United States v. Jinwright*,
   683 F.3d 471 (4th Cir. 2012) ..............................................................25

*United States v. Johnson*,
   114 F.3d 435 (4th Cir. 1997) ..............................................................22

*United States v. King*,
   762 F.2d 232 (2nd Cir. 1985), *cert. denied*, 475 U.S. 1018 (1986) ...............34

*United States v. Kulczyk*,
   931 F.2d 542 (9th Cir. 1991) .............................................................33,34

*United States v. Lanza*,
   790 F.2d 1015 (2nd Cir. 1986) ...........................................................24

*United States v. Lighty*,
   616 F.3d 321 (4th Cir. 2010) ..............................................................22

*United States v. Mastroianni*,
   749 F.2d 900 (1st Cir. 1984)...............................................................43

*United States v. McElhiney*,
   275 F.3d 928 (10th Cir. 2001) ............................................................30

*United States v. McIver*,
   470 F.3d 550 (4th Cir. 2006) ..............................................................45

*United States v. Novak*,
    531 F.3d 99 (1st Cir. 2008)......................................................................42, 43

*United States v. Offil*,
    666 F.3d 168 (4th Cir. 2011) ............................................................45

*United States v. Perkins*,
    363 F.3d 317 (4th Cir. 2004) ............................................................22

*United States v. Poulin*,
    461 Fed. Appx. 272 (4th Cir. 2012) ................................................45

*United States v. Richardson*,
    658 F.3d 333 (3d Cir. 2011) ............................................................23

*United States v. Singleton*,
    2006 U.S. Dist. LEXIS 47961 (S.D. Tex. July 14, 2006) ...............37

*United States v. Tatum*,
    943 F.2d 370 (4th Cir. 1991) ............................................................27

*United States v. Thomas*,
    916 F.2d 647, 652 (11th Cir. 1990) ................................................35

*United States v. Wilkinson*,
    137 F.3d 214 (4th Cir. 1998) ............................................................24

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981)..........................................................................42

## STATUTES & RULES

18 U.S.C. § 1503 ...........................................................................................35
18 U.S.C. § 1512 ...............................................................................33, 34, 36
18 U.S.C. § 1512(b)(3).............................................................................16, 37
18 U.S.C. § 1512(c)(2).......................................................12, 33, 37, 38
18 U.S.C. § 1956 ...............................................................................23, 39
18 U.S.C. § 1956(a)(1)(B)(1)..........................................................................40
18 U.S.C. § 1956(a)(1)(B)(i).............................................................8, 23, 27, 39
18 U.S.C. § 1956(h) ........................................................................................23

18 U.S.C. § 1957 ............................................................................40

18 U.S.C. § 1957(f)(1) ...................................................................40

18 U.S.C. § 3231 ..............................................................................1

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. § 1294 ..............................................................................1


Fed. R. Crim. P. 29(c) ....................................................................22

Fed. R. Evid. 403 ......................................................................46, 47

Fed. R. Evid. 701 ............................................................................46

Fed. R. Evid. 702 ............................................................................45

Fed. R. Evid. 703 ............................................................................45

Fed. R. Evid. 704 ............................................................................46

## CONSTITUTIONAL AMENDMENTS

U. S. Const. amend. IV .................................................................41

U. S. Const. amend. VI .....................................................42, 43, 44

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1294. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. Mr. Farrell was sentenced on July 17, 2017 and timely filed a notice of appeal on July 27, 2017.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the district court erred in giving a jury instruction on willful blindness, administered at the government's request with respect to a series of money laundering offenses, when the evidentiary predicate established by this Court and others for such an instruction was absent.

2. Whether the district court's instruction to the jury, just prior to the verdict, to the effect that all parties in the case were hoping the jury would reach a verdict, was – when taken together with the *Allen* charge in the Court's instructions prior to the start of deliberations – coercive.

3. Whether sufficient evidence existed to support the jury's guilty verdict as to charges of tampering with a witness and tampering with an official proceeding.

4. Whether sufficient evidence existed to support Mr. Farrell's convictions for money laundering and money laundering conspiracy (Counts 1, 2, 3, 5, 6, 7, and 12), when evidence of Mr. Farrell's knowledge that the funds were tainted was absent, as was evidence of concealment by Mr. Farrell.

5. Whether the district court erred in denying Mr. Farrell's motion to suppress conversations Mr. Farrell had with clients, one of whom he had represented before the client began cooperating in the government's investigation, when these conversations were recorded in derogation of the Sixth Amendment right to counsel.

6. Whether the district court erred in admitting testimony about practices of other lawyers and their opinions about Mr. Farrell's conduct, when no such witnesses were qualified as experts and such testimony was more prejudicial than probative.

## STATEMENT OF THE CASE

On October 26, 2015, the government obtained a 12-count indictment against Appellant. JA 19-41.   The indictment alleged one count of money laundering conspiracy (Count 1), six counts of money laundering (Counts 2, 3, 5, 6, 7, 12), three counts of attempted tampering with official proceedings (Counts 4, 9, 11) and two counts of attempted tampering with a witness (Counts 8 and 10). Following a twelve-day jury trial and three days of jury deliberations, Appellant was convicted on Counts 1- 9 and 12.  He was acquitted on Counts 10 and 11. Following denial of post-trial motions for a new trial and for a judgment of acquittal, JA-3065-3109, JA-3320-A, Mr. Farrell was sentenced on July 17, 2017

to 42 months of incarceration.  JA-3321-27.  Appellant filed a notice of appeal on July 27, 2017.  JA-3328-29.

## STATEMENT OF THE FACTS

Appellant James Michael Farrell was a trial lawyer who, in the course of his decades-long career, worked as a public defender in Philadelphia, in small law firms, and in his own law practice. 1/24/17 pm Tr. at 206-208, 211 (JA-1945-47), 1950); 1/25/17 pm Tr. at 168-169 (JA-2167-2168).  In addition to other legal work, Mr. Farrell represented individuals charged with criminal offenses, including narcotics violations and homicide, some of which were death penalty cases. 1/24/17 pm Tr. at 220-221 (JA-1959-60).  This case arises from Mr. Farrell's legal representation of individuals who were being investigated in the District of Maryland in connection with a marijuana distribution organization.

Prior to Mr. Farrell's prosecution here, he was a long-standing member of the Pennsylvania and New Jersey bars. 1/25/17 pm Tr. at 163-164 (JA- 2162-63). Witnesses at trial, including United States District Judge Gregory Sleet, who formerly was Mr. Farrell's law partner, testified to Appellant's strong commitment to his clients, his commitment to excellence and his "impeccable" reputation for being truthful and honest as both a person and a lawyer.  1/24/17 pm Tr. at 212, 228 (JA-1951,1967).

# BACKGROUND

## Appellant's Law Practice

Following graduation from Georgetown University Law Center, Mr. Farrell worked at the Defender's Association of Philadelphia, where he began a career representing individuals charged in criminal cases. Mr. Farrell then started his own private law practice in Philadelphia, continuing his focus on criminal defense and also handling civil personal injury matters and workers' compensation cases. 1/18/17 am Tr. at 24 (JA-1236). In private practice, Mr. Farrell worked primarily as a solo practitioner, although for some periods of time he had a law partner. At all relevant times, Mr. Farrell had two employees working in his office. Amy Pantano worked with Mr. Farrell for 19 years, serving as an office manager, legal assistant and paralegal. *Id*. at 22 (JA-1234). She was responsible for bookkeeping in the office *Id*. at 26 (JA-1238). Johanna D'Alessandro was a legal assistant. *Id*. at 25-26 (JA-1237-38). The cases Mr. Farrell handled and the names of all clients were listed in a ledger kept in the office. *Id*. at 28, 30 (JA-1240, 1242). Included in this ledger were a number of individuals associated with Matt Nicka, whom the government characterized as the head of the marijuana organization at issue, who were under investigation or charged with criminal offenses. *Id*. at 31-33 (JA-1243-45).

Both Mr. Farrell and his office staff handled client payments and typically provided receipts for payments made by cash and check. *Id*. at 34-35, 38 (JA-1246-47, 1250). The money received then was deposited at Mr. Farrell's direction. I*d*. at 37-38 (JA-1249-50). The financial records were stored in Quickbooks. *Id*. at 53 (JA-1265). Mr. Farrell never instructed Ms. Pantano not to record a financial transaction. *Id*. at 81 (JA-1293). Mr. Farrell often sent money to incarcerated clients to be placed in their "commissary accounts," which they could use to buy personal items while incarcerated. *Id*. at 93 (JA-1305). He frequently would use his own money for this purpose. 1/18/17 pm Tr. at 148-149 (JA-1360-61).

A representative from Wachovia Bank (subsequently acquired by Wells Fargo), where Mr. Farrell did his business banking, testified about cash deposits made into his bank account. 1/12/17 am Tr. 70, 73, 74, 75, 76 (JA-509, 512-15). The same witness testified about checks issued from Mr. Farrell's law practice bank account. *Id*. at 68-69, 79 (JA-507-508, 518). The deposits were made using deposit slips. Certain of these slips, along with some of the checks, identified an individual associated with Matt Nicka by name in the memo line and on the deposit slip. *Id*. at 86-88. (JA-525-27).

## The Money Laundering Conspiracy Charge

By at least March of 2009, the Drug Enforcement Agency (DEA) was investigating a number of individuals in connection with a marijuana distribution organization headed by Matt Nicka, which it labeled the "Nicka Organization."

As the DEA's investigation developed, the government issued grand jury subpoenas to witnesses and entered into plea agreements and cooperation agreements with individuals involved in the marijuana operation.  Mr. Farrell provided legal advice and representation to some of these individuals.  Appellant also arranged for other individuals under investigation to obtain their own attorneys.  The government did not introduce any evidence that the legal representation of these individuals was not *bona fide* or that money that was identified as being used to pay for the services of attorneys was not actually provided to these attorneys.

**Count 1**: Count 1 of the Indictment charged Appellant with knowingly conspiring with Matt Nicka and others in his organization to conduct financial transactions involving the proceeds of unlawful activity, *i.e.*, the marijuana sales, while knowing that the money involved in the transactions in which Mr. Farrell participated represented the proceeds of such activity, and knowing that the transactions were designed to conceal and disguise the nature, source or ownership of the illegal proceeds.  Indictment at 1-6 (JA-19-24).  The government alleged that

Mr. Farrell received marijuana proceeds in the form of cash from members of the Nicka organization and used these funds to pay legal fees for members of the group.

The government introduced evidence at Appellant's trial from Andrew Sharpeta, a member of the Nicka organization, that after Nicka and others became aware of the DEA investigation, they decided that of the funds they were owed for previously distributed marijuana, between $5,000.00 and $10,000.00 per person would be set aside for each person they believed had legal exposure regarding his or her involvement in the conspiracy's marijuana distribution. 1/11/17 pm Tr. at 176-181 (JA-347-52). The money, which Nicka was to hold, was to be used to cover legal fees. *Id.* at 180-181 (JA-351-52). No evidence was introduced that Mr. Farrell was aware of this conversation.

Prior to this time, according to Sharpeta, Nicka would use the proceeds of the sale of marijuana to pay legal fees for individuals associated with him who had legal issues. *Id.* at 213-215 (JA-384-386). If an individual was arrested or under criminal investigation, Nicka would pay for his or her legal fees. *Id*. at 214 (JA-385). This money was paid in cash and recorded in a ledger kept by the Nicka organization. *Id*. at 216 (JA-387). Lawyers, including Mr. Farrell, who were representing individuals under investigation, typically were paid in cash. *Id*. at 214-217 (JA-385-88). Nicka was known to give Mr. Farrell's name and phone

number to his acquaintances in case of an emergency.  1/12/17 am Tr. 99  (JA-538).

Counts 2, 3, 5, 6, 7, and 12 of the Indictment charged Mr. Farrell with money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  The government alleged that Mr. Farrell engaged in financial transactions consisting of transfers of money to other lawyers to pay for legal fees of individuals implicated in the marijuana investigation. Indictment at 7-8, 11-12 (JA-25-26, 29-30).  Counts 7 and 12 alleged that appellant knowingly violated this statutory provision by transferring $100 (Count 7) and $150 (Count 12) to the commissary account of an incarcerated member of the Nicka organization, Michael Phillips.  Indictment at 13-14, 21 (JA-31-32,39).

**The Money Transfers to Pay for Legal Representation**

**Counts 2 and 3:**  Count 2 involved a $1,000.00 check drawn on Mr. Farrell's law firm account that he arranged to be sent on or about October 30, 2010, to Warren Brown, an attorney representing criminal defendants in Baltimore, Maryland. Indictment at 7 (JA-25); JA-3059.  Count 3 involved a second check in the amount of $1,500.00 that he arranged to be sent to Mr. Brown on or about November 26, 2010.  *Id*. at 8 (JA-26); JA-3060.  These funds were used to pay Mr. Brown's legal fees to represent Amy Mitchell in connection with a grand jury subpoena she received related to the marijuana investigation.  Amy Mitchell testified that she had

been in a romantic relationship with Adam Constantinides, who sold marijuana for the Nicka Organization. 1/12/17 am Tr. At 93 (JA-532).

In or around October 2010, Ms. Mitchell told the jury, she had received a grand jury subpoena related to the DEA's pending investigation of marijuana distribution. 1/12/17 am Tr. at 107, 116 (JA-546, 555). After receiving the subpoena, she initially contacted attorney Stephen Tully. *Id*. at 130-31 (JA-569-70). Indicating he had a conflict of interest, Mr. Tully referred Ms. Mitchell to Mr. Farrell. *Id*. She contacted Mr. Farrell and met with him in his law office in Philadelphia. *Id*. at 107-108 (JA-546-47). Mr. Farrell told Ms. Mitchell that he could not represent her, but provided the name of another lawyer who, Mr. Farrell said, could help her. *Id*. at 110 (JA-549). Mr. Farrell told Ms. Mitchell that Mr. Brown would help her with the grand jury subpoena and that the legal fees for Mr. Brown would be taken care of. *Id*. at 110-111 (JA-549-50). Ms. Mitchell subsequently met with Mr. Brown, after which he represented her in connection with the grand jury subpoena. *Id*. at 114 (JA-553). Ms. Mitchell did not pay any money to Mr. Brown for his legal services. *Id*. at 114-115 (JA-553-54).

Mr. Brown, whom the government called to testify, was a criminal defense attorney who had been practicing for more than 32 years in federal and state courts. Id. at 141-142 (JA-580-81). Ms. Mitchell did not want to appear in the grand jury, which Mr. Brown did not find unusual based on his experience. *Id*. at 144-145

(JA-583-84).  Mr. Brown testified to his receipt of the two checks, totaling $2,500, from Mr. Farrell for Mr. Brown's representation of Ms. Mitchell.  Mr. Brown deposited both checks into his bank account.  *Id*. 146-147, 149-150 (JA-585-86, 588-89).

**Counts 5 and 6:**  Count 5 involved a $1,250.00 check that Mr. Farrell arranged to be sent to Mr. Tully, an attorney practicing criminal defense in Baltimore, Maryland, on or about April 28, 2011.  Indictment at 11 (JA-29); JA-3061.  Count 6 involved a second $1,250.00 check that Appellant arranged to be sent to Mr. Tully on or about June 20, 2011.  Indictment at 12 (JA-30); JA-3062 The money was to be used to compensate Mr. Tully for representing Adam Constantinides in connection with the marijuana investigation.

Adam Constantinides admitted at trial that he had been a member of the Nicka organization.  1/12/17 pm Tr. at 202 (JA-641).   In April 2011, he was charged with a drug offense in Baltimore.  He was represented by Stephen Tully. *Id*. at 212-214 (JA-651-53).   Mr. Constantinides knew Mr. Tully because his girlfriend at the time, Ms. Mitchell, contacted Mr. Tully after receiving her grand jury subpoena.   1/12/17 am Tr. at 93, 130-131 (JA-532,569-70).   Mr. Constantinides did not give Mr. Tully any money in connection with the representation.  1/12/17 pm Tr. at 214-215 (JA-653-54).  Sherri Doenges, office manager for Mr. Tully's law firm, testified that the total fee charged by Mr. Tully

for his representation of Mr. Constantinides was $2,500.00.  *Id*. at 225 (JA-664).

The funds came in two separate checks from Mr. Farrell.  *Id*. at 226-227 (JA-665-66).

**Counts 7 and 12**: The commissary account transfers at issue in these counts were predicated upon two Western Union money orders Mr. Farrell sent to Michael Phillips, an inmate at the Chesapeake Detention Facility in Baltimore, Maryland, in June 2012 (for $100) and December 2012 (for $150).  Indictment at 13-14, 21 (JA-31-32, 39).  Phillips was involved in the Nicka organization, which led to his 2012 incarceration.

Mr. Phillips testified that he was an old client of Mr. Farrell's, having met him in 2005.  1/17/17 am Tr. at 90 (JA-1016).  Farrell had represented Phillips in two or three prior criminal matters.  *Id*.  In 2009, Phillips was arrested in Pennsylvania and charged in state court with a drug offense.  *Id*. at 51 (JA-977).  While he was incarcerated at the Chester County Prison in that prior matter, unrelated to the activities of the Nicka Organization charged here, Phillips received money orders from Farrell and others for his commissary account. 1/17/17 pm Tr. at 156-158 (JA-,1082-84).

After he was released from incarceration related to the 2009 state court matter, Phillips met with Farrell to discuss the federal indictments of members of the Nicka organization.  1/17/17 am Tr. at 60-61 (JA-986-87).  In April 2011,

Phillips was arrested and charged as part of the federal investigation of the Nicka organization.  *Id*. at 64-65 (JA-990-91).  Mr. Phillips then was represented by Todd Henry.  *Id*. at 66-67 (JA-992-993).   Mr. Phillips did not pay Mr. Henry to represent him and was told by Mr. Henry that Phillips' friends had arranged the representation.  *Id*.

While Phillips was incarcerated related to the federal indictment, he communicated with Mr. Farrell directly and through Mr. Henry to ask Farrell to put money on his commissary account in the jail.  *Id*. at 70-71 (JA-996-97).  Farrell sent Phillips a number of money orders, including the $100 and the $150 money orders that formed the basis of the money laundering charges in Counts 7 and 12. The money orders sent to Phillips bore Farrell's signature and the office address of his law firm.  JA-3020-21, 3022-23.  Other money orders Farrell sent to Phillips included a cover letter from Farrell's law firm.   1/18/17 am Tr. at 74-75, 138-139 (JA-1286-87, 1350-51).

Mr. Henry also put money in Phillips' commissary account.  1/17/17 am Tr. at 94 (JA-1020).

### Charges Related to Appellant's Interactions with Jacob Harryman

**Count 4**: Farrell was charged with tampering with an official proceeding, this being a forfeiture proceeding relating to the property of Jacob Harryman, in violation of 18 U.S.C. § 1512(c)(2).  Indictment at 9-10 (JA-27-28).

According to his trial testimony, Harryman distributed marijuana for the Nicka Organization.  1/13/17 am Tr. At 38-42 (JA-729-33).    Harryman would receive marijuana from co-conspirator Anthony Marcantoni, which Harryman resold.  *Id*. at 38-39 (JA-729-30).  In November 2010, Harryman was arrested and charged with distribution of marijuana in Maryland state court.  *Id*. 44 (JA-735). Harryman was represented in the state court proceeding by Leonard Shapiro.  *Id*. at 45, 47-48 (JA-736, 738-39).  In January 2011, Harryman began cooperating with state and federal law enforcement authorities.  1/13/17 am Tr. at  61-62 (JA-752-53).

On January 13, 2011, at the direction of law enforcement, Harryman traveled to Philadelphia to meet with Farrell, ostensibly to seek legal advice in connection with the DEA's pending attempt to forfeit Harryman's property.  *Id*. at 63-64. (JA-754-55).   Law enforcement authorities did not give Harryman a recording device for this meeting.  *Id*. at 64 (JA-755).  During the meeting, Harryman discussed his criminal charges with Farrell, as well as a general approach to all of the criminal proceedings related to members of the Nicka organization, specifically what was referenced as a "collapsed defense theory." According to Mr. Harryman's understanding, this theory contemplated all of the targets of the investigation standing together.  *Id*. at 65-66, 142 (JA-756-57, 833). In addition, Harryman and Farrell discussed items that had been seized by the IRS

and DEA, resulting in forfeiture proceedings against Harryman. *Id*. at 69 (JA-760). Harryman told Farrell that he might want to hire Farrell to represent him in his pending state court case. 1/13/17 pm Tr. at 182 (JA-873). Other members of the Nicka organization had told Harryman that Farrell was a good asset forfeiture lawyer. 1/13/17 pm Tr. at 215 (JA-906).

On February 9, 2011, at the direction of the DEA, Harryman called Farrell. 1/13/17 am Tr. at 115-116 (JA-806-07). On the call, they discussed the seizure of items from Harryman when a search warrant was executed in November 2010. *Id*. at 118 (JA-118); JA-3015-16; JH-3. Prior to the call with Farrell, Harryman had received correspondence from the IRS and DEA about the seized items. 1/13/17 am Tr. at 118-119 (JA-809-10).

On February 16, 2011, Harryman met with Farrell at the direction of the DEA, ostensibly to seek legal advice involving the forfeiture proceeding. 1/13/17 am Tr. at 121-122 (JA-812-13). At the government's direction, Harryman wore a recording device. JA-2988-3014; JH-2, 2.1-2.6 This second meeting between Farrell and Harryman was in Maryland, in a highway rest area. 1/13/17 am Tr. at 122 (JA-813). Harryman brought the documents he had received from the IRS and DEA related to the seized property, and he discussed the forfeiture process with Farrell. *Id*. at 123-124, 126-129 (JA-814-815, 817-820). During the meeting, Farrell reviewed these documents and asked him to sign a notice of claim form that

14

was included in the documents received from the IRS. *Id.* at 130-131 (JA-821-22). Harryman did not actually sign documents related to the pending forfeiture proceeding. *Id.* at 132 (JA-823). Harryman understood that Farrell was going to prepare and file paperwork with the IRS and DEA related to the forfeiture proceedings based on their discussion. *Id.* at 136, 139-140 (JA-827, 830-31). They also discussed the impending deadlines to submit a claim for the seized items and that the forms would be submitted before the relevant deadlines. *Id.* at 138-139, 170 (JA-829-830, 861).

Based on the information provided by Harryman, Farrell thereafter prepared and filed the documents necessary for Harryman to perfect his claim with the DEA contesting the seizure of his property. 1/13/17 pm Tr. at 156-163 (JA-847-854); JA-2866-2886. Harryman did not sign the affidavits submitted to the DEA. 1/13/17 pm Tr. at 221 (JA-912). The tampering with an official proceeding charge in Count 4 was based on the fact that Harryman's signatures on these affidavits were executed and dated on the DEA forms either by Farrell or his office assistant, Johanna D'Alessandro, at the direction of Mr. Farrell. 1/18/17 am Tr. at 125-127, 128-130 (JA-1337-42). The affidavits submitted to the DEA were notarized by either Farrell or Johanna D'Alessandro at the direction of Farrell[1]. *Id.* at 68-73 (JA-1280-85); 1/18/17 am Tr. at 126-127, 129-131 (JA-1338-39, 1341-43). There

---

[1] Mr. Farrell was able to act as a notary based on his status as a lawyer licensed in the State of New Jersey. 1/18/17 am Tr. at 82 (JA-1294).

was no evidence that the information on the submitted DEA forms was factually incorrect; it was consistent with the information provided by Mr. Harryman during his meeting with Mr. Farrell on February 16, 2011.  1/13/17 pm Tr. at 172 (JA-863).

Harryman ultimately entered a settlement agreement with the government regarding the items seized by the DEA and obtained some of the seized property back from the government.  *Id*. at 217 (JA-908).

### Charges Related to Interactions with Ryan Forman

**Count 8**: Farrell was charged with knowingly attempting to tamper with a witness, Ryan Forman, in violation of 18 U.S.C. § 1512(b)(3).  Indictment at 15-16 (JA-33-34).  Mr. Forman was, at the time, a cooperating witness in the case against Nicka and others then pending in the United States District Court for the District of Maryland: *United States v. Nicka, et al*., case number 10-cr-0777 (RWT).  During his interactions with Forman, Farrell did not know that Forman had signed a cooperation agreement.  Count 8 alleged that Farrell improperly attempted to limit the information that Forman would provide to law enforcement and prosecutors, should Forman decide to agree to provide a proffer of facts to the government in the course of its investigation of the Nicka marijuana operation.

Forman ran a family pawn shop in Philadelphia.  1/19/17 pm Tr. at 228 (JA-1688).  He had been associated with the Nicka organization.  He sold watches to

Nicka and introduced buyers of marijuana to Nicka. *Id.* at 229-230 (JA-1689-90). Forman also gave two of Nicka's associates, Dave D'Amico and Jeff Putney, a $100,000.00 loan to purchase an airplane for their marijuana distribution operation. *Id*. at 231-232 (JA-1691-92). Forman testified about Nicka's investments in real property and a casino. 1/24/17 am Tr. at 58-60 (JA-1797-99).

In June 2009, Forman received a grand jury subpoena related to the investigation of the Nicka organization. *Id*. at 236-237 (JA-1696-97). Forman then contacted Farrell to seek legal advice. *Id*. At a meeting, they discussed the subpoena and a strategy to respond to it. *Id*. at 239-240. (JA-1699-1700). Forman did not appear before the grand jury at that time and kept in monthly contact with Farrell regarding the status of the case until his arrest in 2012. 1/24/17 am Tr. at 4-5 (JA-1743-44).

In May 2012, Forman was arrested and charged with offenses relating to his affiliation with the Nicka organization. 1/19/17 pm Tr. at 241-242 (JA-1701-02). At his initial appearance, Forman was represented by Nicholas Pinto, Esq., a lawyer who had a professional relationship with Farrell. 1/19/17 pm Tr. at 205-207 (JA-1665-67). Pinto shared office space with Farrell for five years. 1/18/17 am Tr. at 29 (JA-1241). Pinto entered his appearance on behalf of Forman on May 17, 2012. 1/19/17 pm Tr. at 206-207 (JA-1666-67).

Subsequently, Forman arranged to be represented by Joseph Murtha, an attorney in Maryland. 1/19/17 pm Tr. at 193-194, 196 (JA-1653-54, 1656). However, Forman continued to seek legal advice from Mr. Farrell, who previously had represented Mr. Forman during 2009-2012. After he was indicted, Mr. Forman began cooperating with the government, entering into a cooperation agreement with the legal assistance of Mr. Murtha. *Id*. at 197-198 (JA 1657-58). As part of his cooperation, Forman agreed to work with law enforcement and record his interactions with Farrell when he met with him while pretending to continue to seek Farrell's legal advice. *Id*. at 243-245 (JA-1703-05). At trial, Forman's counsel, Mr. Murtha, explained his perspective regarding the cooperation process, including how a proffer agreement operates in his experience and the obligations of the government and a defendant under such an agreement. *Id*. at 198-201 (JA-1658-1661). Murtha testified that clients can limit the scope of their cooperation with the government. *Id*. at 217-218 (JA-1677-1688). He said he would never tell a client to withhold information in connection with a proffer and would not tell a client "to only tell the government what the government already knows." *Id*. at 222-223 (JA-1682-83).

Forman had signed a proffer agreement with the government in June 2012, prior to the interactions with Mr. Farrell charged in the Indictment. 1/19/17 pm Tr. at 199-200 (JA-1659-60); 1/24/17 am Tr. at 99-100 (JA-1838-39). On July 11,

2012, Forman met with Farrell at Farrell's office, ostensibly to seek legal advice from Farrell.    1/19/17 pm Tr.   at 245 (JA-1705).    At the direction of law enforcement, Forman wore recording equipment and recorded the meeting.  *Id*. at 245-246 (JA-1705-06); RF-3; (JA-3029-3048).   During the meeting, Forman told Farrell he was struggling financially and had spent a substantial amount of money on legal fees.  (JA-3041).   Forman asked Farrell whether money could be secured to pay Forman's legal fees. JA-3042.  Forman understood Farrell to say that  Nicka might be able to provide cash to pay Forman's legal fees and that Nicka might be more inclined to provide this money if Murtha agreed to share information with Farrell and the counsel for the other individuals involved.  1/24/17 am Tr. at 29-30 (JA-1768-69).  During this meeting, Forman told Farrell he was more comfortable with Farrell than with his retained counsel, Murtha.  1/24/17 am Tr. at 88 (JA-1827); JA-3044.    Farrell encouraged Forman to proffer information to the government, but only if Forman was sufficiently prepared to do so.  *Id*. at 89 (JA-1828); JA-3039, 3043-46  Mr. Farrell stated that Mr. Forman should "only go into a proffer prepared enough to give them nothing more than what they already know." (JA-3039).    This meeting, on July 11, 2012, formed the basis for the charges in Counts 8 and 9, alleging that Mr. Farrell tampered with a witness and tampered with an official proceeding.

19

## Jury Note

After almost three weeks of trial, the case was submitted to the jury. On the third day of deliberations, the jury sent a note, reading: "If after hours of conversation, we are unable to agree on a particular count or counts, what happens?" 2/2/17 pm Tr. At 2 (JA-2826). In responding to this note, the district court instructed the jury that "all parties in a jury trial are hopeful that the jury will be able to reach unanimous verdicts and conclude the case and that's the goal of every party and every judge." *Id*. at 16 (JA -2840). Mr. Farrell's counsel objected to this supplemental charge, *Id*. at 17 (JA-2841), which followed an *Allen* charge in the initial charge to the jury.

## SUMMARY OF ARGUMENT

Farrell was known to the government relatively early in its investigation of the Nicka organization because of his representation of individuals involved in the organization. Farrell provided legal advice to these individuals and discussed their legal rights and options with them, in at least one instance, near the inception of the government's investigation, advising a client -- Mr. Forman -- not to cooperate at that time in the government's investigation. This is advice that any criminal lawyer must have the prerogative to dispense if she or he deems it in the client's best interest, even if the government finds it frustrating or upsetting. In some instances, he arranged for them to be represented by other lawyers. The government targeted

Farrell for prosecution and employed a number of investigative techniques seeking to develop evidence against him. One such technique included invading the attorney client relationship by sending individuals into his office posing as clients seeking legal advice.

None of the offenses of which Mr. Farrell was convicted was supported by legally sufficient evidence, and other errors at trial necessitate reversal of his convictions.

With respect to Farrell's convictions for money laundering offenses and conspiracy to commit money laundering, the government's evidence failed to establish that Mr. Farrell knew that the funds at issue had an illicit source. Nor was there evidence that Mr. Farrell sought to conceal the source of the funds at issue. In fact, Mr. Farrell's disbursement of funds was open, overt and notorious, done in his own name, using his own checking account, or money orders purchased by his office. The government sought to remedy this dearth of evidence by seeking and receiving a jury instruction on willful blindness, but the necessary predicate for such an instruction was absent. Another jury instruction, provided by the court after days of deliberation and just prior to verdict, was impermissibly coercive.

With respect to the tampering charges of which Mr. Farrell was convicted, the government did not elicit evidence of a corrupt intention to tamper with a witness or a proceeding that would have allowed any reasonable factfinder to

convict.  Further, the government elicited prejudicial and otherwise impermissible opinion evidence, adverse to Mr. Farrell, from government witnesses, with virtually no countervailing probative value.

## STANDARDS OF REVIEW

### I.    Willful Blindness Instruction

This Court reviews a decision to give a particular jury instruction for abuse of discretion.  *United States v. Lighty*, 616 F.3d 321, 377 (4th Cir. 2010) (citing *United States v. Abbas*, 74 F.3d 506, 513 (4th Cir. 1996)).

### II.    Allen Charge

This Court reviews a challenge to a decision to give an *Allen* charge and the content of any charge given for abuse of discretion.  *United States v. Burgos*, 55 F.3d 933, 935 (4th Cir. 1995).

### III.    Sufficiency of the Evidence

This Court reviews a trial court's denial of a post-trial motion for judgment of acquittal under Fed. R. Crim. P. 29(c) *de novo*.  *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005).

### IV.    Denial of Motion to Suppress

This Court reviews a trial court's legal determination regarding suppression of evidence de novo, and factual findings for clear error.  *United States v. Perkins*, 363 F.3d 317, 320 (4th Cir. 2004) (*citing United States v. Johnson*, 114 F.3d 435, 439 (4th Cir. 1997)).

**ARGUMENT**

I.  **The Evidence Did Not Support A Jury Instruction on Willful Blindness.**

Mr. Farrell was convicted of six counts of "concealment money laundering" in violation of 18 U.S.C. § 1956(a)(1)(B)(i), as well as one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h)).  To obtain these convictions, the government argued that the jurors could infer Mr. Farrell's knowledge because he was willfully blind to the likelihood that the funds he received for legal services he and others provided were proceeds from the Nicka organization.  1/27/17 am Tr. at 64-65 (JA-2609-10); 1/26/17 am Tr. at 100-101 (JA-2374-75).  As part of its charge to the jury following the close of all the evidence, the district court administered an instruction, to which Mr. Farrell objected, sanctioning the government's theory of willful blindness.  1/27/17 am Tr. at 33-34 (JA-2578-79).  Administering this jury instruction was error warranting reversal of Mr. Farrell's money laundering convictions.

18 U.S.C. § 1956 requires that the alleged violator have acted knowingly; that is, with "actual subjective knowledge."  *United States v. Campbell*, 977 F.2d 854, 857 (4th Cir. 1992); *see also United States v. Cone*, 714 F.3d 197, 214 (4th Cir. 2013) (quoting *United States v. Richardson*, 658 F.3d 333, 337-38 (3d Cir. 2011)) (the government must prove the defendant's "knowledge that the [property involved in the charged financial transaction] involved the proceeds of some form

of unlawful activity" as well as "knowledge that the transaction was designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity."); *accord United States v. Wilkinson*, 137 F.3d 214, 221 (4th Cir. 1998); *United States v. Hale*, Nos. 91-5597 and 91-5609, 1992 U.S. App. LEXIS 16148 at *11-12 (4th Cir. July 15, 1992) (citing and quoting *United States v. Lanza*, 790 F.2d 1015, 1022 (2nd Cir. 1986)) (with respect to conspiracy, the government must prove the defendant's "knowing participation or membership in the alleged conspiracy and knowledge of the unlawful aims or objects of the conspiracy.").

While evidence of willful blindness may be used to establish the requisite knowledge in some circumstances, this Court has acknowledged that "courts are wary" of instructing the jury on willful blindness because it may soften the government's burden of proof, or worse, create a presumption of guilt. *United States v. Ebert*, 1999 U.S. App. LEXIS 8453, at *35 (4th Cir. 1999). As a result, this Court has adopted a four-part test for willful blindness: "A defendant's deliberate ignorance of an operative fact will suffice for actual knowledge of that fact if (1) the defendant was aware of a high probability of the existence of the fact (2) yet deliberately avoided learning whether the fact existed (3) with the conscious purpose of evading criminal liability, (4) unless the defendant genuinely believed that the fact did not exist." *Id.* at *32-*33; 1/26/17 Tr. at 97 (JA-2371)

(government acknowledging the four-part test during charge conference). *See also Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (the willful blindness doctrine requires that the defendant must "subjectively believe that there is a high probability that a fact exists" and take "deliberate actions to avoid learning of that fact"); *United States v. Jinwright*, 683 F.3d 471, 480 (4th Cir. 2012) (same). Because the government failed to adduce the requisite evidence to meet this rigorous standard for a willful blindness instruction, it was error for the district court to instruct the jury on willful blindness over defense counsel's objection.[2] Further, it was error for the district court to deny Mr. Farrell's motion for a new trial based on the improper willful blindness instruction.

The government's summary of its evidence in closing argument is illuminating. With respect to whether Mr. Farrell deliberately closed his eyes to what would otherwise have been obvious to him, the government focused repeatedly on (1) the size of the Nicka organization's marijuana distribution operation, and (2) individuals' payment of legal fees in cash, both to suggest that

---

[2] Notably, in opposing Mr. Farrell's motion for a new trial, the government contended that there was abundant evidence of Mr. Farrell's actual knowledge of the illicit source of the funds at issue. 7/17/17 Tr. at 14 (JA-3165) ("but let there be no mistake that the government proved there was actual knowledge in this case of what Mr. Farrell knew"). If correct, this contention should operate to preclude a willful blindness jury instruction, because evidence consistent with actual knowledge does not justify a willful blindness instruction. *Ebert*, 1999 U.S. App. LEXIS 8453 at * 35 ("An ostrich instruction is not allowed when the evidence shows that the defendant [ ] had actual knowledge of the fact in question….") (internal citations omitted).

Farrell should have known that the legal fees he received were drug proceeds. 1/27/17 am Tr. at 66-74 (JA-2611-19). The government undercut its own argument regarding cash payments by conceding, correctly, that "it's not illegal to receive cash as a lawyer." *Id*. at 90 (JA-2635). In any event, what Farrell should have known is irrelevant because he "may not be convicted on just what he should have known." *United States v. Heaps*, 39 F.3d 479, 484 (4th Cir. 1994).

The remainder of the government's evidence, according to its own closing argument, amounts to nothing more than what is encompassed in appropriate legal representation. For example, the government cited evidence that Nicka was Farrell's client and that Farrell was aware Nicka and others were being investigated for drug-related crimes. 1/27/17 am Tr. at 81 (JA-2626). Naturally, criminal defense lawyers are aware of who their clients are and of what they are accused. The government's investigation, or even an indictment, of a client does not put Mr. Farrell on notice of his client's guilt such that he can be said to be willfully blind to the fact that proceeds from the client's allegedly guilty conduct are being used to pay legal fees. Indeed, the opposite is true: he is entitled to presume his client innocent until the government proves otherwise beyond a reasonable doubt.

Even assuming Farrell was aware of a significant probability that the legal fees he received or disbursed to other lawyers were drug proceeds, the government did not introduce any evidence that he took deliberate steps to avoid learning this

fact in order to avoid criminal liability. The government's lack of evidence on this point is unsurprising, given that it is not at all clear what deliberate steps Farrell could have taken. Such affirmative steps would have had to include interrogating his own client to determine the source of the funds. But this Court long has held that criminal defendants have a Sixth Amendment right to conflict-free, loyal legal representation, and the denial of such representation may amount to ineffective assistance of counsel. *See, e.g.*, *United States v. Tatum*, 943 F.2d 370, 375 (4th Cir. 1991) ("The effective performance of counsel requires meaningful compliance with the duty of loyalty and the duty to avoid conflicts of interest, and a breach of these basic duties can lead to ineffective representation."). If Farrell were required to investigate his client in order to protect his own "substantial personal interests"—in this case, not being indicted himself—this would have created an actual, unresolvable, and impermissible conflict. *Id.* Mr. Farrell submitted a declaration below from an ethics expert on this point, in connection with his motion for a new trial. JA-3082-89.

The government may be expected to rely on *United States v. Blair*, 661 F.3d 755 (4th Cir. 2011), for the proposition that it is appropriate to prosecute an attorney for money laundering under 18 U.S.C. § 1956(a)(1)(B)(i) notwithstanding the above-described concerns. In that case, however, the fact that the defendant was an attorney was "pure coincidence." *Blair*, 661 F.3d at 773. This Court

emphasized that *Blair* was not a case in which a defense attorney accepted "bona fide legal fees from clients charged with or suspected of criminal conduct." *Id.* Instead, the defendant in *Blair* "paid for attorneys for others in a criminal enterprise with what he plainly knew to be criminally derived funds." *Id.* Mr. Farrell's case, in contrast, is much more like the situation that concerned Judge Traxler in dissent. Judge Traxler observed that the possibility that funds provided to a criminal defense lawyer are tainted "leaves the attorney with somewhat of a Hobson's choice at the outset of a case: either investigate fully and risk learning that the client's funds are tainted, or avoid thoroughly investigating any matter that might lead to such knowledge." *Id.* at 778. The only choice an attorney would have to avoid gaining knowledge that his client's funds are tainted is to abdicate his responsibility to investigate and prepare the client's case. *Id.* at 777-78. As Judge Traxler concluded, that choice is no choice at all. *Id.* at 778.

Willful blindness is particularly problematic in the prosecution of criminal defense attorneys for money laundering, as Judge Traxler explained, and is especially so when, as here, the government fails to establish the necessary factual predicates to justify the use of the willful blindness doctrine to prove knowledge beyond a reasonable doubt. The court's willful blindness instruction therefore was erroneous, Mr. Farrell's motion for a new trial on that ground should have been

granted, and his money laundering and money laundering conspiracy convictions should be reversed.

## II.   The Allen Charge Was Unduly Coercive.

On the second day of deliberations, the jury sent two notes indicating that it was having difficulty understanding some of the evidence.  For example, one note stated, "Count 8-Can you please clarify what this count especially refers to" and, with respect to Count 11, "what is the official proceeding the government refers to, that they're accusing Farrell of interfering?"  JA-3426.  The second note asked questions about counts 7 and 12.  JA-3427.  With respect to the money orders that had been disbursed to Phillips, the jury asked, "what about those 2 [money orders cited in Counts 7 and 12] singles them out as criminal? We have trouble understanding what make them criminal, but the other money orders are not criminal."  *Id*.  The court responded by referring the jury to the court's instructions. 1/31/17 am Tr. at 50-52 (JA-2819-21).

On the third day of deliberations, the jury sent the court another note, which stated:  "If after hours of conversation, we are unable to agree on a particular count or count[s], what happens."  2/2/17 pm Tr. at 2 (JA-2826).  The district court responded, in part, by telling the jury that "all parties in a jury trial are hopeful that the jury will be able to reach unanimous verdicts and conclude the case and that's the goal of every party and every judge."  *Id*. at 16 (JA-2840).  Mr. Farrell objected

to this instruction and sought a new trial on this basis.  2/2/17 pm Tr. at 17 (JA-2041); JA-3071-3109)

An *Allen* charge "'must not coerce the jury, and it must be fair, neutral and balanced.'"  *United States v. Cornell*, 780 F.3d 616, 625 (4th Cir. 2015) (quoting *United States v. Cropp*, 127 F.3d 354, 359-360 (4th Cir. 1992)).  "It is critical that an *Allen* charge not coerce one side or the other into changing its position for the sake of unanimity."  *Burgos*, 55 F.3d at 941.  A charge to the jury may be unduly coercive "where the . . . charge caused the jury to be 'influenced by concerns irrelevant to their task . . . ."  *United States v. Boone*, 458 F.3d 321, 326 (3rd Cir. 2006) (citing and quoting *United States v. Jackson*, 443 F.3d 293, 297 (3rd Cir. 2006)).

The district court's statement that it is the "goal of every party and the judge" to reach a unanimous verdict was unduly coercive.  Even with the additional language of the instruction, the response to the February 2, 2017 jury note suggested that a deadlock was not an appropriate resolution of cases and both parties and the Court disfavored such an outcome.  In *United States v. McElhiney*, a similar instruction was found to be impermissibly coercive.  275 F.3d 928 (10th Cir. 2001).  The trial court in *McElhiney* "repeatedly emphasized the desirability of a verdict and the court's desire to have a verdict reached."  *McElhiney*, 275 F.3d at 944.  "These statements by the district court that it wanted a verdict might all too

easily have led the jury to think it more important to achieve unanimity to please the district court rather to remain true to its honest beliefs. . . ." *Id*. That is what happened here, and Farrell's convictions should be reversed on this basis.

### III.  The Jury's Verdict Finding Appellant Guilty of Counts 4, 8 and 9 Was Not Based on Sufficient Evidence.

Counts 4, 8, 9, 10 and 11 of the indictment charge tampering with an official proceeding and with a witness.  These charges relate to the submission of the Harryman forfeiture forms (Count 4); witness tampering and tampering with an official proceeding in connection with Farrell's advice to Forman about a proffer session (Counts 8 and 9); and witness tampering and tampering with an official proceeding in connection with tendering funds for Forman for payment of his legal fees (Counts 10 and 11).  The jury acquitted Farrell on Counts 10 and 11.  Our submission here is that Farrell's convictions on Counts 4, 8 and 9 were not based on sufficient evidence, and that the district court erred when it denied Farrell's post-trial motion for judgment of acquittal concerning these counts.

As to Count 4, the government's evidence showed that Farrell met with Harryman and discussed with him the DEA and IRS forfeiture notice that Mr. Harryman had received.  1/13/17 am Tr. at 121-124, 126-129 (JA-812-15, 817-20); JH-2; JA-2988-3014.  The two men discussed the forfeiture process and the fact that Mr. Farrell was going to prepare and file the necessary documents to preserve Harryman's claim of interest in the seized property.  1/13/17 am Tr. at 136, 139-

140 (JA-827, 830-31).  While Harryman did not sign the forms in question, and the

forms suggested that he had signed them, the *content* of the forms submitted to the

DEA was factually correct and based on information provided by Harryman during

his meeting with Farrell on February 16, 2011.  Harryman testified:

> Q: Is there anything in any of those affidavits that contains any information
> about the assets that you talked to Mr. Farrell about at the rest area?
> A: Yes, sir.  It—
> Q: Pardon?
> A: I'm sorry.  Go ahead.
> Q: It's okay.  Is there anything in any of those affidavits that contains any
> information different from what you told Mr. Farrell during the course of
> that visit?
> A: No, there's not.

1/13/17 pm Tr. at 172 (JA-863).  Accordingly, these forms were not submitted

with the requisite corrupt purpose.

Farrell's convictions on Counts 8 and 9 related to the conversations

concerning legal advice that Forman pretended to seek from Farrell, at a time when

Forman was – unbeknownst to Farrell -- cooperating with the government and

secretly recording his conversations at the government's direction.    Forman

pretended to seek advice from Farrell about how to address his pending criminal

matter, including whether to proffer information to the government.  JA-3029-3048

Farrell advised him to be well-prepared for the proffer session and said he should

"only go into a proffer prepared enough to give them nothing more than what they

already know." (JA-3039).

"A defendant challenging the sufficiency of the evidence faces a heavy burden." *United States v. Foster,* 507 F.3d 233, 245 (4th Cir. 2007), *cert. denied,* 552 U.S. 1274 (2008). The evidence must be viewed in the light most favorable to the government, determining whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *United States v. Collins,* 412 F.3d 515, 519 (4th Cir. 2005). "However, the court must be satisfied that there is substantial evidence; that is, when viewed in the light most favorable to the Government, 'evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'" *United States v. Bonner*, 735 F. Supp. 2d 405, 407 (M.D.N.C. 2010), *quoting United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

Title 18 U.S.C. §1512, the statute underlying all three of the counts at issue, criminalizes corruptly obstructing, influencing or impeding an official proceeding (§1512(c)(2), the basis for Counts 4 and 9), as well as corruptly persuading or engaging in misleading conduct toward another person with intent to hinder, delay or prevent the communication to law enforcement of information relating to federal criminal offenses (the basis for Count 8). A defendant cannot violate Section 1512 as a matter of law if he does not attempt to coerce or mislead the individual in question (*e.g.,* if the defendant tells the individual to tell the government a story that both already believe is false there is no violation). *United States v. Kulczyk*,

931 F.2d 542, 546-547 (9th Cir. 1991) ("non-coercive, non-deceptive conduct is not covered by §1512"), *citing United States v. King,* 762 F.2d 232 (2nd Cir. 1985), *cert. denied*, 475 U.S. 1018 (1986).  Simply "urging and advising" false testimony does not violate the statutes.  The *Kulczyk* Court, finding that there was "simply no [evidentiary] support for the argument that Kulczyk did anything other than ask the witnesses to lie," reversed the Section 1512 convictions in that case.

*Kulczyk* and *United States v. Doss,* 630 F.3d 1181 (9th Cir. 2011), support the proposition that acquittal on Counts 4, 8 and 9 is legally required.  *Doss* held that Section 1512 requires that the conduct at issue be undertaken "for an improper purpose" in order to satisfy the requirement that it be "corrupt."  *Id.* at 1189. There is insufficient evidence that Mr. Farrell's advice to either Mr. Forman or Mr. Harryman was for an improper purpose.  Mr. Farrell did not seek to persuade either of them to lie in the context of an official proceeding.

With respect to the Harryman forfeiture documents, Mr. Farrell's conduct was not corrupt for the purposes of Section 1512 as a matter of law because all of the factual information in the forfeiture forms was concededly consistent with the information Mr. Harryman provided to Mr. Farrell, 1/13/17 pm Tr. at 172 (JA-863), and the government did not seek to contest the accuracy of this information. There is no evidence that Mr. Harryman would not have signed the affidavits in question had they been presented to him.

The fact that Appellant, after having been authorized by Harryman to represent him in the forfeiture matter, caused the forms to be signed for Harryman and notarized is not "corrupt," since it was not undertaken "for an improper purpose." The fact that Farrell did not endeavor to provide factually false information to the DEA when he submitted the Harryman forfeiture forms compels a judgment of acquittal on Count 4. *See United States v. Baldridge*, 559 F.3d 1126, 1143 (10th Cir. 2009) (requiring an intent to bring about false or misleading testimony in order to demonstrate requisite corruption); *United States v. Farrell*, 126 F.3d 484, 488 (4th Cir. 1997) (noting requirement under Section 1512 that an attempt be made to provide false information to investigators); *cf. United States v. Blair*, 661 F.3d 755 (4th Cir. 2011) (under 18 U.S.C. §1503, the government is required to establish a nexus between the false statement and the obstruction of justice, i.e., it must be proven that the false statements "had the nature and probable effect of impeding justice") (*quoting United States v. Thomas*, 916 F.2d 647, 652 (11th Cir. 1990). While it may have been unethical or otherwise illegal for a lawyer to sign his client's name on a document and have his assistant notarize it, absent any evidence that it was done corruptly and for an improper purpose, it is not a criminal act under §1512.

With respect to Counts 8 and 9, the evidence established that Farrell had provided legal advice to Mr. Forman for several years (2009-2012) preceding the

time when Mr. Forman came to him secretly wearing a recording device, expressing dissatisfaction with his current lawyer and asking for legal advice about a potential proffer to the government. Farrell's advice regarding the proffer process, taken in the light most favorable to the government, cannot constitute either coercing or misleading Mr. Forman in violation of Section 1512. Forman did not produce a proffer agreement for Appellant to review, so Appellant was not in a position to know anything about its terms. Mr. Farrell did not know that Forman had already signed a cooperation agreement and agreed to proffer with the government.

The evidence elicited at trial demonstrated that proffer agreements can vary in their terms. The language of proffer agreements is a matter of negotiation between the prosecutor and the defense attorney, individuals can proffer without a written proffer agreement, and defendants can limit the scope of cooperation with the government. 1/19/17 pm Tr. at 217-218 (JA-1677-68); 1/25/17 pm Tr. at 157-158 (JA-2156-57). At the time Forman came to meet with Farrell, it was clear, based on the government's lengthy investigation of the Nicka organization, that the government already knew a great deal of information regarding the marijuana operation and the persons involved. No evidence was elicited that even if Forman told the government only what it "already knew," that this would mean he was withholding any information at all from the government. Nor is there any evidence

that Farrell had any reason to believe that doing so would have violated any proffer agreement with the government, and hence that doing so would have been misleading to the government. Farrell did not tell Forman to lie. Accordingly, there is no factual basis for the conclusion that Farrell's advice to Forman constitutes conduct that is corrupt or misleading as required to convict under §1512 (b)(3). *United States v. Farrell,* 126 F.3d 484, 489 (3d Cir. 1997) ("more culpability is required for a statutory violation of § 1512 than that involved in the act of attempting to discourage disclosure in order to hinder an investigation"; a situation "in which an attorney advises a client not to reveal information about his participation in a conspiracy to law enforcement officials . . . is expressly excluded from the reach of the statute"). For the same reasons, the evidence as to Count 9 is insufficient because that count is based on identical conduct.

In addition, the lack of connection to tangible evidence underlying the charge in Count 8 requires reversal. While this Court has affirmed convictions under 18 U.S.C. § 1512(c)(2) based on attempts to interfere with a criminal investigation and prosecution, *United States v. Crandle*, 274 F. App'x 324, 327 (4th Cir. 2008), courts interpreting this provision have held that § 1512(c)(2) requires a "nexus to tangible evidence," meaning a "record, document or tangible object." *United States v. Singleton,* 2006 U.S. Dist LEXIS 47961 (S.D. Tex. July 14, 2006). In *United States v. Hutcherson*, the court stated that a violation of § 1512(c)(2)

occurs when "an individually corruptly obstructs an official proceeding through his conduct in relation to a tangible object." *United States v. Hutcherson* No. 6:05CR00039, 2006 U.S. Dist. LEXIS 6652, at *7 (W.D. Va. Feb. 3, 2006). Mr. Farrell's legal advice to Forman lacks a nexus to any tangible document. Mr. Farrell did not know that Mr. Forman had already signed a proffer agreement when the statement was made. As such, the required nexus under § 1512(c)(2) is absent and Mr. Farrell's conviction on Count 8 cannot stand.

## IV. Appellant's Convictions for Money Laundering and Money Laundering Conspiracy (Counts 1, 2, 3, 5, 6, 7, and 12) Were Not Based on Sufficient Evidence.

The district court erred when it denied Farrell's motions for judgment of acquittal as to the money laundering counts at the close of the government's evidence, the close of all of the evidence, and after trial. The evidence established that what Farrell did, in dispensing funds of unproven origin to other lawyers to represent other individuals, was similar to what occurs in virtually every "white collar" criminal case in which the conduct of a corporation is under criminal investigation. That is, counsel for the corporation learns that employees of the corporate entity need separate counsel. She or he contacts other counsel, typically a lawyer they know. That lawyer assumes representation for the individual in question, is paid by the corporation (typically facilitated by counsel for the corporation) and, frequently, reports back to counsel for the corporation what the

individual's lawyer has learned from her or his client's meeting with the government or grand jury appearance. The government may not like this sequence of events, but it is not illegal and not prosecutable, even if the lawyer for the corporation is aware of the possibility that some of the funds used to pay these lawyers was generated by the corporation's allegedly illegal activity. Nothing more or less than that occurred here when Mr. Farrell engaged lawyers to represent individuals under investigation and disbursed funds to them.

Four of the substantive money laundering charges were premised solely on checks that Mr. Farrell wrote, overtly, on his law firm account to other lawyers to represent individuals who needed representation in the investigation (Counts 2, 3, 5 and 6). A conviction for "concealment money laundering" under §1956 (a)(1)(B)(i), as was charged here, requires a financial transaction designed to "conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." Typically, such concealment activity requires evidence of the use of phony names, shell corporations, or straw purchases. *See e.g. United States v. Bolden*, 325 F.3d 471, 490 (4th Cir. 2003). No such evidence was presented in this case. Rather, the evidence showed that Mr. Farrell wrote checks from his law firm account to two other lawyers without any attempt to conceal that he was doing so. Evidence of concealment is a critical element for conviction under §1956 and is the principal

distinction between that section and §1957, which does not require proof of concealment but contains a "safe harbor" provision prohibiting prosecution of attorneys engaging in transactions to secure legal representation for clients. *See* §1957 (f)(1). The government chose to avoid this provision of §1957 by charging concealment money laundering under §1956 (a)(1)(B)(1). However, the government merely presented proof of checks written from one lawyer to another, with no evidence of concealment to support this charge.

Counts 7 and 12 concern the $100 and $150 money orders that Mr. Farrell sent to Phillips' commissary account. The government did not attempt to trace these funds back to an illegal source. No evidence was elicited that Farrell knew the funds were tainted, and certainly no evidence of concealment existed, since Mr. Farrell made these payments overtly and notoriously, in his own name. In light of the evidence that Farrell often made such payments to help out clients who were incarcerated and did so using his own money, 1/18/17 am Tr. at 93 (JA-1305), there is insufficient evidence, as a matter of law, to conclude that these payments were proceeds of unlawful activity or were concealed.

In light of the failure of proof on the substantive money laundering counts, the conspiracy count (Count 1) must fail as well. There is no additional evidence to support this count beyond the evidence discussed above.

## V. The Trial Court Erred in Denying Appellant's Motion to Suppress His Conversations with Clients.

The government's investigation intruded on attorney-client relationships that Farrell had established with individuals whom he had represented over several years.  The government approached Forman and Harryman and arranged for them to contact and meet with Farrell, each wearing a government-supplied recording device, ostensibly to seek legal advice from him.  The government obtained no warrant or probable cause determination by a judicial officer that such recording was appropriate.  The government apparently was indifferent to the fact that these individuals had in the past sought legal advice from Mr. Farrell, took advantage of the fact that Mr. Farrell would readily agree to meet with them because of these past relationships and interactions, and requested that they break the bond of their privileged relationship and meet with Mr. Farrell to pretend to seek legal advice.

Forman and Harryman were, at the time of their recorded conversations with Farrell, consulting other lawyers.  It is, however, not at all unusual or impermissible for someone who has consulted lawyer A to also consult lawyer B and indeed, sometimes, even switch lawyers.  The fact that these individuals also consulted other lawyers does not change the fact that they approached Mr. Farrell seeking legal advice from him.  Farrell was not a stranger to them; he had previously advised Forman and had met with Harryman prior to the interaction that formed the basis of the charge in the Indictment.

Indeed, Farrell fulfilled his duty of loyalty to these clients when he met with Forman and Harryman, reasonably expecting, based on their past attorney-client relationship with him, that these individuals were again seeking legal advice in a privileged setting. The government then used Mr. Farrell's duty of loyalty against him, knowing that he would readily agree to meet with Mr. Forman and Mr. Harryman to try to help them as he had in the past.

The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law and is central to our adversary system of justice. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). [3] It permits both the client and the attorney to discuss the legal issue at hand, without fear that their communications are being overheard by the government. The attorney-client privilege and the Sixth Amendment right to counsel are intertwined. One cannot exist and function properly without the other. When the government invades the attorney-client privilege it undermines the Sixth Amendment. Justice O'Connor recognized this fact when, siting by designation, she authored the opinion in *United States v. Novak*, 531 F.3d 99 (1st Cir. 2008). In *Novak*, the government recorded conversations between an inmate (Holyoke) and his lawyer (Novak) and

---

[3] As the Supreme Court noted, the "rationale for the privilege has long been recognized." *Upjohn Co*. 449 U.S. at 389, *quoting Hunt v. Blackman,* 128 U.S. 464, 470 (1888) (privilege "is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure").

then sought to use the conversations in a prosecution of the lawyer. The district court granted Novak's motion to suppress the recordings based on the Fourth Amendment. On appeal, while reversing the suppression of the evidence based on the Fourth Amendment, Justice O'Connor characterized the recording of the attorney-client conversations as "troubling" because of their invasion of the Sixth Amendment right to counsel. *Id*. at 103:

> No doubt, the monitoring of Holyoke's calls to his attorney presents a significant Sixth Amendment issue. *Cf. Swidler & Berlin v. United States*, 524 U.S. 399, 403, 118 S. Ct. 2081, 141 L. Ed. 2d 379 (1998) (discussing importance of attorney-client privilege); *United States v. Mastroianni*, 749 F.2d 900, 907 (1st Cir. 1984).

*Id.* at 102. However, because Novak had not raised the Sixth Amendment issue on appeal, the First Circuit did not rule on that ground when it reversed the district court's ruling. Nevertheless, even after concluding that Holyoke had consented to the recording of the calls, Justice O'Connor repeated her concern about the government's tactics, stating:

> We recognize that there are [Sixth Amendment] Constitutional dimensions to the monitoring that occurred we do not discuss in this opinion. The monitoring of these calls, made between an attorney and a client who is seeking legal advice, is troubling….

*Id.* at 103.

Mr. Farrell's case presents an even more troubling Sixth Amendment-related concern than in *Novak* because the recordings here took place either in Mr. Farrell's law office (with Mr. Forman) or in a separate meeting place where

Mr. Farrell agreed to meet Mr. Harryman. The government invaded that confidential space. This Court should heed the concern expressed by Justice O'Connor, find that the government's conduct violated the Sixth Amendment and public policy, and hold that Mr. Farrell's motion to suppress this evidence should have been granted.

## VI. The Trial Court Erred in Admitting Testimony About Practices of Other Lawyers.

The government sought impermissibly to bolster its case by calling several other lawyers as witnesses to give their opinions about some of the matters at issue. The government presented prejudicial and non-probative testimony from a number of lawyers that they would not have done certain acts that Mr. Farrell was alleged to have done. For example, over objection, Leonard Shapiro was asked, "Have you as part of your practice ever paid another lawyer cash related to a case?" 1/17/17 am Tr. at 123 (JA-1049). He replied, "Not one time ever." *Id.* Another witness testified that Mr. Shapiro had referred to Mr. Farrell as a "dirty" lawyer. 1/13/17 am Tr. at 93 (JA-784). Mr. Murtha, who had represented Mr. Forman in negotiating his proffer and cooperation agreements, was asked, "would you ever tell a client to withhold information when they went into [a] proffer?" 1/19/17 pm Tr. at 221-224 (JA-1681-84). Mr. Murtha responded, over objection, by saying no, and that such actions would be "a violation of the [proffer] agreement" and "could be a violation of a federal law." *Id* at 223 (JA-1683). Again, over objection by

counsel, in an obvious reference to the statement made by Mr. Farrell that forms the basis of Counts 8 and 9, Mr. Murtha then was then asked, "would you tell your client to only tell the government what the government already knows?" *Id.* He responded that he would not do that. *Id.* The government asked Mr. Brown about the appropriateness of a lawyer communicating a person that was represented by counsel. Over objection, Mr. Brown testified that "it's a violation of the Code of Professional Responsibility, the rules of ethics" for a lawyer to speak with someone that is represented by counsel." 1/12/17 pm Tr. 193-194 (JA-632-33).

It is well established that "a witness may not give 'opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts." *United States v. Poulin*, 461 Fed. Appx. 272, 282 (4th Cir. 2012) (*citing and quoting United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006). Admissible testimony is that which will "assist the jury," and "testimony that provides 'no information other than the witness's views on how the verdict should read' is unhelpful to the jurors. *Poulin*, 461 Fed. Appx. at 282 (*citing and quoting United States v. Offil*, 666 F.3d 168, 175 (4th Cir. 2011).

The lawyers who testified in this case were not qualified as experts under Fed. R. Evid. 702 and 703. They should not have been permitted to testify to their specialized knowledge as lawyers and offer their opinions, as lay witnesses, that they disapproved of Mr. Farrell's conduct or that they believe his conduct might

have violated ethical rules or was unlawful. *See* Fed. R. Evid. 701 (lay opinion testimony may not be based on specialized knowledge).

While Fed. R. Evid. 704 does not preclude testimony regarding ultimate issues, it "does not open the door to all opinion." *Buckman v. Bombardier Corp.*, 893 F.Supp 547, 562 (E.D.N.C. 1995). Rule 704 does not allow "questions which would merely allow the witness to tell the jury what result to reach" and is not intended "to allow a witness to give legal conclusions." *Id.* (internal citations omitted). The testimony from Mr. Murtha evaluating the advice that Farrell had provided to Forman about proffering to the government constitutes an opinion on the ultimate issues of fact and a legal conclusion. The other attorneys' testimony about cash payments and speaking to individuals who were represented by other lawyers also was objectionable because it was not helpful to the jury and suggested unlawful conduct by Mr. Farrell based on the opinions of other lawyers.

This evidence was more prejudicial than probative, and hence, pursuant to Fed. R. Evid. 403, should not have been admitted. Rule 403 bars the admission of relevant evidence "if its probative value if substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . .". "The prejudice which [Rule 403] is designed to prevent is jury emotionalism or irrationality." *United States v. Hernandez*, 975 F.2d 1035, 1041 (4th Cir. 1992) (*citing and quoting United States v. Greenwood*, 796 F.2d 49, 53 (4th Cir. 1986).

Evidence should be excluded under Rule 403 where "there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence. *Hernandez*, 975 F.2d at 1041 (internal citation and quotation omitted).

The prejudicial effect of this evidence was damaging to Farrell. A lay jury has no basis to find that a cash payment to a lawyer was improper, but the testimony of Mr. Shapiro suggested that it was improper. The jury would not be expected to appreciate the duty of loyalty that Farrell owed to Forman when he agreed to meet with him and discuss the possibility of proffering information to the government, but the testimony of Mr. Brown suggested that it was improper even to meet with Forman, despite the fact that Forman requested the meeting, and, during the course of it, expressed dissatisfaction with his present counsel. Murtha's testimony about how he handles proffer sessions did not establish that Mr. Farrell's conduct was improper and hence was not probative evidence. The government presented this testimony as if these lawyers were experts, suggesting that the jury should judge Mr. Farrell's conduct based on their assertions. This was a violation of Rule 403 and infected the jury's view of all of Mr. Farrell's conduct on all counts. Accordingly, the admission of this testimony was reversible error.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that Mr. Farrell's convictions should be reversed.

Respectfully Submitted,

*/s/ Barry Coburn*

_____

Barry Coburn
Coburn & Greenbaum PLLC
1710 Rhode Island Avenue, N.W.
Second Floor
Washington, DC 20036
(202) 643-9472
barry@coburngreenbaum.com

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App.
   32(a)(7)(B) because:

   The word count of this brief is <u>11,340</u>

2. This brief complies with the typeface requirements of Fed. R. App. P.
   32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   This brief has been prepared in a proportionally spaced typeface using
   <u>Microsoft Word, Times New Roman, 14 point</u>.


                                        /s/  Barry Coburn
                              _____
                                        Barry Coburn

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of March, 2018, I caused to be delivered a true and accurate copy of the foregoing through this Court's electronic filing service to:

Sandra Wilkinson, Esq.
Assistant United States Attorney
6406 Ivy Lane 8th Fl.
Greenbelt,  MD 20770

/s/  Barry Coburn
_____

Barry Coburn